*B139*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | )    Criminal No. *22-86* |
| v. | )    **[UNDER SEAL]** |
| | ) |
| CHARLES HUNTER HOBSON | )    (18 U.S.C. §§ 2, 371, 1349, 1956(a)(2)(A), |
| | )    1956(h); 15 U.S.C. § 78dd-2) |

## INDICTMENT

The grand jury charges:

## GENERAL ALLEGATIONS

FILED

MAR 29 2022

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

At all times relevant to this Indictment, unless otherwise specified:

### A.    Relevant Statutory Background

1.    The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq*. ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign government official for the purpose of influencing the foreign official, inducing the foreign official to take or omit certain acts, and securing an improper advantage in order to assist those classes of persons in obtaining or retaining business for, or directing business to, any person.

### B.    Relevant Individuals and Entities

2.    Company 1 was a coal mining company headquartered in the Western District of Pennsylvania.    Company 1 mined, processed, and sold metallurgical coal to customers in the domestic and international steel industry.    Company 1 operated mines in Pennsylvania and Maryland and conducted business in domestic and foreign markets, including, at various times,

Egypt and Turkey.   Company 1 was a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).

3.      Al Nasr Company for Coke and Chemicals ("Al Nasr" or "NCCC") was a state-owned and state-controlled coke company of the Arab Republic of Egypt ("Egypt") and performed a function that Egypt treated as its own.   Al Nasr was an "instrumentality" of the Egyptian government, and Al Nasr's officers and employees were "foreign officials," as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

4.      Between in and around 2016 and in and around 2020, Al Nasr contracted with Company 1 to purchase coal.   During that time, Company 1 shipped coal to Al Nasr in Egypt on multiple occasions.   In total, Al Nasr paid Company 1 approximately $143 million in connection with these coal shipments.   Company 1 earned millions of dollars in profits in connection with the sale of coal to Al Nasr.

5.      Defendant CHARLES HUNTER HOBSON was a United States citizen and resident of Tennessee.   Between in and around 2016, and in and around March 2018, Company 1 employed HOBSON in various international sales positions, including as Vice-President of Appalachian Business.   In and around late 2016, HOBSON established Company 1's formal sales relationship with Al Nasr and served in that role until in and around March 2018 when he purchased a subsidiary of Company 1 and spun it off as a separate entity.   HOBSON was a "domestic concern," and an employee and agent of a "domestic concern," as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

6.      Frederick Cushmore Jr. was a United States citizen and resident of Connecticut. Between in and around late 2016, and in and around October 2020, Cushmore was employed by Company 1 in various international sales positions, including Vice-President, Head of

International Sales.   In and around early 2018, Cushmore succeeded HOBSON as Company 1's primary point of contact with Al Nasr.   Cushmore was a "domestic concern," an employee and agent of a "domestic concern," and a stockholder thereof acting on behalf of a "domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

7.     Co-Conspirator A was an Egyptian national who controlled and operated Company 2, a business entity based in Egypt.   Company 1 contracted with Co-Conspirator A, through Company 2, to serve as Company 1's sales agent in Egypt.   Co-Conspirator A and Company 2 acted as an intermediary between Company 1 and Al Nasr for the purpose of negotiating and securing Company 1's business with Al Nasr in Egypt.   Co-Conspirator A and Company 2 were agents of a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1).

8.     Foreign Official A was an Egyptian national and a high-level executive at Al Nasr. Foreign Official A was a "foreign official" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(2)(A).

## COUNT ONE

The grand jury further charges:

9.      Paragraphs 1 through 8 are incorporated as if fully set forth herein.

### The Conspiracy and Its Object

10.     Beginning in and around late 2016, and continuing through in and around early 2020, in the Western District of Pennsylvania, and elsewhere, the defendant, CHARLES HUNTER HOBSON, did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Cushmore, Co-Conspirator A, and other persons known and unknown to the grand jury, to commit an offense against the United States, that is, being a domestic concern and an employee and agent of a domestic concern, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing an act and decision of such foreign official in his or her official capacity; (ii) inducing such foreign official to do and omit to do an act in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence any act and decision of such government and agencies and instrumentalities, in order to assist HOBSON, Cushmore, Company 1, and others in obtaining and retaining business for and with, and directing business to HOBSON, Cushmore, Company 1, and others, in violation of Title 15, United States Code, Section 78dd-2(a).

**Purpose of the Conspiracy**

11.     The purpose of the conspiracy was for HOBSON and his co-conspirators, acting for and on behalf of Company 1, to obtain and retain lucrative sales contracts with, and other business advantages from, Al Nasr by making corrupt bribe payments to Foreign Official A and other Egyptian government officials, through Co-Conspirator A and Company 2.

**Manner and Means of the Conspiracy**

12.     It was a manner and means of the conspiracy that HOBSON and his co-conspirators, including Cushmore and Co-Conspirator A, discussed, decided, and agreed that, in order to increase Company 1's international business, Company 1 would offer and pay bribes through Co-Conspirator A and Company 2 to foreign officials at Al Nasr, including, but not limited to, Foreign Official A, to secure lucrative coal business from Al Nasr.

13.     It was a further manner and means of the conspiracy that HOBSON and Cushmore, acting on behalf of Company 1, contracted to pay Co-Conspirator A commissions, directly and through Company 2, intending that a portion of such commissions would be used to pay bribes to foreign officials at Al Nasr, including, but not limited to, Foreign Official A.

14.     It was a further manner and means of the conspiracy that Co-Conspirator A identified foreign officials at Al Nasr to bribe to ensure that Company 1 would secure and retain Al Nasr's business.

15.     It was a further manner and means of the conspiracy that HOBSON, Cushmore, and Co-Conspirator A referred to the foreign officials, including, but not limited to, Foreign Official A, and others, as members of "the team."

16.     It was a further manner and means of the conspiracy that HOBSON, Cushmore, and Co-Conspirator A used multiple means of communication—including SMS text messaging,

encrypted messaging services, telephone conversations, e-mails, and in-person meetings—to discuss the details of the bribery scheme and the specifics of how much each member of "the team," including, but not limited to, Foreign Official A, would be paid in bribes.

17.     It was a further manner and means of the conspiracy that HOBSON and his co-conspirators, including Cushmore and Co-Conspirator A, understood and intended that a portion of the commissions that Company 1 paid to Co-Conspirator A, directly and through Company 2, would be passed on as bribes to foreign officials at Al Nasr, including, but not limited to, Foreign Official A, in order to influence acts and decisions of such foreign officials in their official capacities, to induce such foreign officials to do and omit to do certain acts, to secure improper business advantages on behalf of Company 1 from Al Nasr, and to induce such foreign officials to use their influence to benefit Company 1's business, including, but not limited to, by:

a.      helping Company 1 obtain multiple coal sales contracts with Al Nasr;

b.      helping Company 1 secure a long-term sales contract with Al Nasr for the sale of coal; and

c.      providing HOBSON and his co-conspirators, including Cushmore and Co-Conspirator A, with inside, non-public information about Company 1's competitors' bids to sell coal to Al Nasr.

18.     It was a further manner and means of the conspiracy that HOBSON, Cushmore, and other co-conspirators caused Company 1 to use means and instrumentalities of interstate commerce to make payments of more than approximately $4.8 million in commissions to Co-Conspirator A, directly and through Company 2, in connection with Company 1's sale of coal to Al Nasr, a portion of which was used to pay bribes to foreign officials at Al Nasr, including, but not limited to, Foreign Official A.

6

19.    It was a further manner and means of the conspiracy that HOBSON and others would communicate with Company 1 personnel located in the Western District of Pennsylvania concerning the payments of Co-Conspirator A's commissions.

20.    It was a further manner and means of the conspiracy that HOBSON and Co-Conspirator A referred to various Al Nasr foreign officials, including Foreign Official A, by their initials or other nicknames in order to conceal the officials' true identities and obscure the fact that such foreign officials were receiving bribe payments.

21.    It was a further manner and means of the conspiracy that, in order to conceal the bribery scheme, HOBSON and his co-conspirators, including Cushmore and Co-Conspirator A, emphasized the need to use encrypted messaging services—including WhatsApp—as well as personal, non-Company 1 e-mail accounts to communicate, and such communications included the use of means and instrumentalities of interstate commerce.

22.    It was a further manner and means of the conspiracy that HOBSON continued to communicate with Cushmore and Co-Conspirator A about Company 1's coal contracts with Al Nasr after HOBSON purchased a subsidiary of Company 1 and spun it off as a separate entity in or around March 2018.

### Overt Acts

23.    In furtherance of the conspiracy and to achieve the objects thereof, at least one of the conspirators committed or caused to be committed, in the Western District of Pennsylvania and elsewhere, at least one of the following overt acts, among others:

24.    On or about November 14, 2016, HOBSON sent an email to Cushmore and another Company 1 executive regarding the potential purchase of coal by Al Nasr from Company 1.   In

Case 2:22-cr-00086-RJC   Document 3   Filed 03/29/22   Page 8 of 22

the email, HOBSON stated, "When shipping to this destination there typically are a few that the agent has to take care of when cutting a deal."

25.    On or about November 24, 2016, Co-Conspirator A sent HOBSON a WhatsApp message confirming that the "Chairman" of Al Nasr had signed an amendment to the contract between Company 1 and Al Nasr.  In the message, Co-Conspirator A requested that HOBSON send him an original copy of the commission letter signed and stamped, noting that a corporate "[s]tamp is an important thing to all state owned companies."

26.    On or about December 31, 2016, HOBSON sent an SMS text message to Co-Conspirator A regarding the contract for Company 1's first shipment, and asking Co-Conspirator A, "Did you offer the chairman extra money.   The extra discount?"

27.    On or about December 31, 2016, HOBSON sent an SMS text message to Co-Conspirator A asking, "How much of the fees does chairman get?"

28.    On or about January 30, 2017, Co-Conspirator A sent HOBSON an SMS text message specifying how much of Co-Conspirator A's anticipated $450,000 commission would be paid to various members of the conspiracy, including $50,000 to Foreign Official A, whom Co-Conspirator A referred to by the codename "M," and $50,000 to HOBSON, whom Co-Conspirator A referred to by the codename "HH."

29.    In and around February 2017, Company 1 sent a shipment of coal to Al Nasr in Egypt.

30.    On or about March 15, 2017, Co-Conspirator A faxed to HOBSON two invoices for commissions related to a shipment of coal to Al Nasr that departed for Egypt on or about February 13, 2017, the first on behalf of Co-Conspirator A totaling approximately $433,000, and the second on behalf of Company 2 totaling approximately $4,000.

8

31.     On or about March 16, 2017, HOBSON emailed the two invoices he received from Co-Conspirator A to employees in the financial department of Company 1 in the Western District of Pennsylvania.

32.     On or about April 20, 2017, Company 1 wired a payment of approximately $385,167 from its bank account in Ohio to Co-Conspirator A's bank account in the United Arab Emirates.

33.     On or about April 25, 2017, Cushmore wrote to HOBSON, via encrypted WhatsApp message, that "[w]e should do more on this [i.e., WhatsApp] since it's encrypted."

34.     On or about April 26, 2017, HOBSON sent Co-Conspirator A a WhatsApp message stating, "[P]ay those buddy [sic] the 10-20k. TAKE CARE OF THE TEAM AND YOU! It's too important to take care of them 1st so [Co-Conspirator A] and [HOBSON] save face."

35.     On or about April 26, 2017, Co-Conspirator A sent HOBSON a WhatsApp message stating that "[Company 1] should keep its promise with me in order to keep my promise with my team as well.  Why to accept 20k while you should have your 50k complete[?]"

36.     On or about May 7, 2017, HOBSON forwarded to Cushmore, via a WhatsApp message, information HOBSON had received from Co-Conspirator A about a bid that one of Company 1's competitors had submitted to Al Nasr.   In the forwarded message, Co-Conspirator A described the competitor's bid information as "top secret."

37.     On or about May 26, 2017, HOBSON sent Cushmore a WhatsApp message stating, "Here is one of my text[s] to [Co-Conspirator A]: If these thieves that work at NCCC want their share of the commission they will work with us on pricing."

38.     In and around July 2017, Company 1 sent a shipment of coal to Al Nasr in Egypt.

39.     On or about August 10, 2017, Co-Conspirator A faxed to HOBSON two invoices for commissions related to a shipment of coal that departed for Egypt on or about July 16, 2017. The first invoice was submitted on behalf of Co-Conspirator A and totaled approximately $240,000.   The second invoice was submitted on behalf of Company 2 and totaled $5,000.

40.     On or about August 10, 2017, HOBSON emailed both invoices to employees in the financial department of Company 1 in the Western District of Pennsylvania, requesting that they inform him when the payment was sent.

41.     On or about August 31, 2017, Company 1 wired a payment of approximately $240,000 from its bank account in Ohio to Co-Conspirator A's bank account in the United Arab Emirates.

42.     On or about September 25, 2017, HOBSON sent an SMS text message to Co-Conspirator A stating, "I cannot pay any more than $5.5 [per metric ton] commission.   So if [codename for foreign official] needs money then you will have to manage how its distributed."

43.     On or about October 16, 2017, Co-Conspirator A met with HOBSON and other Company 1 executives in the Western District of Pennsylvania regarding the long-term agency agreement between Company 1 and Co-Conspirator A/Company 2.

44.     In and around July 2019, Company 1 sent a shipment of coal to Al Nasr in Egypt.

45.     On or about August 21, 2019, Company 1 wired a payment of approximately $419,000 from its bank account in Ohio to Co-Conspirator A's bank account in the United Arab Emirates.

46.     In and around October 2019, Cushmore traveled to Egypt for meetings with Co-Conspirator A and foreign officials at Al Nasr, including Foreign Official A.

47.    In and around December 2019, Company 1 sent a shipment of coal to Al Nasr in Egypt.

In violation of the Title 18, United States Code, Section 371.

## COUNTS TWO AND THREE

The grand jury further charges:

48.     Paragraphs 1 through 47 are incorporated as fully set forth herein.

49.     On or about the dates set forth in each Count below, in the Western District of Pennsylvania and elsewhere, the defendant, CHARLES HUNTER HOBSON, being a domestic concern and an employee and agent of a domestic concern, did willfully make use of, and cause to be used and aid, abet, counsel, command, induce, and procure the use of, the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official and to a person, while knowing that all and a portion of such money and thing of value would be and had been offered, given, and promised, directly and indirectly, to a foreign official, for purposes of: (i) influencing an act and decision of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do an act in violation of the lawful duty of such official; (iii) securing an improper advantage; and (iv) inducing such foreign official to use his or her influence with a foreign government and agencies and instrumentalities thereof to affect and influence any act and decision of such government and agencies and instrumentalities, in order to assist HOBSON, Cushmore, Company 1, and others in obtaining and retaining business for and with, and directing business to, HOBSON, Cushmore, Company 1, and others:

| COUNT | APPROXIMATE DATE | MEANS AND INSTRUMENTALITIES OF INTERSTATE AND INTERNATIONAL COMMERCE |
|---|---|---|
| 2 | April 20, 2017 | HOBSON caused employees of Company 1, located in the Western District of Pennsylvania, to initiate a wire transfer in the amount of $385,166 from Company 1's bank account in Ohio to Co-Conspirator A's bank account in the United Arab Emirates. |
| 3 | August 10, 2017 | HOBSON sent an email to employees of Company 1 in the Western District of Pennsylvania, directing payment of invoices totaling $240,000 to Co-Conspirator A. |

In violation of Title 15, United States Code, Section 78dd-2; and Title 18, United States Code, Section 2.

## COUNT FOUR

The grand jury further charges:

50.     Paragraphs 1 through 47 are incorporated as fully set forth herein.

51.     Beginning in and around late 2016, and continuing through in and around early 2020, in the Western District of Pennsylvania, and elsewhere, the defendant, CHARLES HUNTER HOBSON, did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Cushmore, Co-Conspirator A, and other persons known and unknown to the grand jury, to commit an offense against the United States in violation of Title 18, United States Code, Section 1956(a)(2)(A), to wit: to knowingly transport, transmit, and transfer, and cause to be transported, transmitted, and transferred, a monetary instrument and funds from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity.

52.     It is further alleged that the specified unlawful activity is: (i) a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2; and (ii) an offense against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Egyptian law, pursuant to Title 18, United States Code, Section 1956(c)(7)(B)(iv).

In violation of Title 18, United States Code, Section 1956(h).

14

## COUNTS FIVE AND SIX

The grand jury further charges:

53.     Paragraphs 1 through 47 are incorporated as fully set forth herein.

54.     On or about the dates set forth in each Count below, in the Western District of Pennsylvania and elsewhere, the defendant, CHARLES HUNTER HOBSON, knowingly transported, transmitted, and transferred, and aided, abetted, and caused others to transport, transmit, and transfer, and attempted to transport, transmit, and transfer, the following monetary instruments and funds from a place in the United States to and through a place outside the United States, with the intent to promote the carrying on of a specified unlawful activity, that is: (i) a felony violation of the FCPA, Title 15, United States Code, Section 78dd-2; and (ii) an offense against a foreign nation involving bribery of a public official and the misappropriation, theft, and embezzlement of public funds by and for the benefit of a public official, in violation of Egyptian law, pursuant to Title 18, United States Code, Section 1956(c)(7)(B)(iv), as follows:

| COUNT | APPROXIMATE DATE OF TRANSACTION | RELEVANT TRANSACTION |
|-------|-------------------------------|----------------------|
| 5 | April 20, 2017 | Employees of Company 1, located in the Western District of Pennsylvania, initiated and participated in initiating a wire transfer in the amount of $385,166.67 from Company 1's bank account in Ohio to Co-Conspirator A's bank account in the United Arab Emirates. |
| 6 | August 31, 2017 | Employees of Company 1, located in the Western District of Pennsylvania, initiated and participated in initiating a wire transfer in the amount of $240,000 from Company 1's bank account in Ohio to Co-Conspirator A's bank account in the United Arab Emirates. |

In violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## COUNT SEVEN

The grand jury further charges:

55.     Paragraphs 1 through 47 are incorporated as fully set forth herein.

### The Conspiracy and Its Object

56.     From in and around late 2016, and continuing through in and around at least mid-2019, in the Western District of Pennsylvania, and elsewhere, the defendant, CHARLES HUNTER HOBSON, knowingly and willfully did conspire, combine, confederate, and agree with Co-Conspirator A to commit an offense against the United States, that is, wire fraud, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

57.     The purpose of the conspiracy was for HOBSON and Co-Conspirator A to arrange for the payment of tens of thousands of dollars in concealed kickbacks to HOBSON from commissions that Company 1 paid Co-Conspirator A, directly and through Company 2, in connection with coal shipments Al Nasr purchased from Company 1.

### Manner and Means of the Conspiracy

58.     It was a manner and means of the conspiracy that HOBSON and Co-Conspirator A discussed, decided, and agreed that HOBSON would receive a portion of the commission payments made by Company 1 to Co-Conspirator A.

59.     It was a further manner and means of the conspiracy that HOBSON, acting on behalf of Company 1, negotiated and contracted with Co-Conspirator A, regarding the amounts of commission payments that Company 1 would pay Co-Conspirator A, directly and through Company 2, while concealing from Company 1 that a portion of such commission payments would be misappropriated by HOBSON in the form of kickbacks for his personal benefit.

60.     It was a further manner and means of the conspiracy that when Co-Conspirator A communicated with Company 1 personnel other than HOBSON regarding commission payment negotiations, Co-Conspirator A would conceal his kickback arrangement with HOBSON.

61.     It was a further manner and means of the conspiracy that HOBSON and Co-Conspirator A used multiple means of communication—including SMS text messaging and encrypted messaging services—to discuss the details of the kickback scheme and the specifics of how much of the commission payments HOBSON would receive.

62.     It was a further manner and means of the conspiracy that the amount of HOBSON's kickbacks would fluctuate depending upon the amount of the commission payments that Company 1 agreed to pay Co-Conspirator A and Company 2 in connection with coal shipments to Al Nasr.

63.     It was a further manner and means of the conspiracy that HOBSON and Co-Conspirator A would communicate with Company 1 personnel located in the Western District of Pennsylvania concerning the amount of Co-Conspirator A's commission payments.

64.     It was a further manner and means of the conspiracy that HOBSON and Co-Conspirator A would cause Company 1 personnel located in the Western District of Pennsylvania to initiate commission payments to Co-Conspirator A from which Co-Conspirator A would later pay kickbacks to HOBSON.

65.     It was a further manner and means of the conspiracy that HOBSON and Co-Conspirator A continued to communicate about kickbacks Co-Conspirator owed HOBSON, and arranged for the payment of such kickbacks, after HOBSON purchased a subsidiary of Company 1 and spun it off as a separate entity in and around March 2018.

66.     It was a further manner and means of the conspiracy that Co-Conspirator A used Western Union to facilitate the transfer of approximately $17,000 in kickback payments to HOBSON.

67.     It was a further manner and means of the conspiracy that Co-Conspirator A used bank transfers to facilitate the payment of approximately $150,000 in additional kickback payments to HOBSON.

68.     It was a further manner and means of the conspiracy that Co-Conspirator A directed HOBSON to fabricate an invoice for consultancy services that Co-Conspirator A could use to make the $150,000 bank transfer to HOBSON appear legitimate.

**Acts in Furtherance of the Conspiracy**

69.     On or about February 1, 2017, Co-Conspirator A sent a $1,000 payment to HOBSON via a Western Union transfer from Egypt.

70.     On or about February 14, 2017, Co-Conspirator A sent a $1,000 payment to HOBSON via a Western Union transfer from Egypt.

71.     On or about May 18, 2017, Co-Conspirator A sent a $2,000 payment to HOBSON via a Western Union transfer from Egypt.

72.     On or about May 21, 2017, Co-Conspirator A sent a $2,000 payment to HOBSON via a Western Union transfer from Egypt.

73.     On or about June 15, 2017, Co-Conspirator A sent a $2,000 payment to HOBSON via a Western Union transfer from Egypt.

74.     On or about June 20, 2017, Co-Conspirator A sent a $2,000 payment to HOBSON via a Western Union transfer from Egypt.

75.     On or about August 28, 2017, Co-Conspirator A sent a $3,000 payment to HOBSON via a Western Union transfer from Egypt.

76.     On or about August 30, 2017, Co-Conspirator A sent a $3,000 payment to HOBSON via a Western Union transfer from Egypt.

77.     On or about September 6, 2017, Co-Conspirator A sent a $1,000 payment to HOBSON via a Western Union transfer from Egypt.

78.     On or about October 23, 2017, Co-Conspirator A sent a WhatsApp message to HOBSON, explaining the breakdown of HOBSON's kickback payments associated with four of Company 1's shipments of coal to Al Nasr.

79.     On or about July 25, 2018, HOBSON sent Co-Conspirator A a WhatsApp message stating, "I need some type of deposit between now and September 30.  Can you please find a way to get at least 10k to me in the meantime?  I wouldn't ask if it was not extremely necessary brother."

80.     On or about October 16, 2018, Co-Conspirator A sent HOBSON a WhatsApp message requesting that HOBSON email a "consultancy fee" invoice "ASAP in order to confirm the Wire."

81.     On or about the same day, October 16, 2018, HOBSON emailed Co-Conspirator A the requested sham invoice for purported consultancy services to support a wire transfer of a $150,000 kickback payment from Co-Conspirator A's bank account in the United Arab Emirates to HOBSON's bank account in the United Arab Emirates.

82.     On or about November 1, 2018, HOBSON caused a wire transfer of approximately $99,968 from HOBSON's bank account in the United Arab Emirates to his bank account in Knoxville, Tennessee.

83.     On or about August 15, 2019, Hobson caused a wire transfer of approximately $9,462 from HOBSON's bank account in the United Arab Emirates to his bank account in Knoxville, Tennessee.

In violation of Title 18, United States Code, Section 1349.

## FORFEITURE ALLEGATIONS

84.     The United States hereby gives notice to the defendant charged in Counts One through Three and Count Seven that, upon his conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses, including, but not limited to, the following described property:

> (a) A sum of money in an amount to be determined by the Court representing the amount of proceeds obtained as a result of the offense.

85.     The United States hereby gives notice to the defendant charged in Counts Four through Six that, upon his conviction of any such offenses, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982, of all property involved in each offense of conviction in violation of Title 18, United States Code, Section 1956, or conspiracy to commit such offenses, and all property traceable to such property.

86.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> (a) cannot be located upon the exercise of due diligence;
>
> (b) has been transferred or sold to, or deposited with, a third party;
>
> (c) has been placed beyond the jurisdiction of the Court;
>
> (d) has been substantially diminished in value; or
>
> (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c) and Title 18, United States Code,

Section 982, to seek forfeiture of any other property of the defendant, CHARLES

HUNTER HOBSON, up to the value of the forfeitable property described above.


                                                    A True Bill,



                                                    FOREPERSON



CINDY K. CHUNG                                      JOSEPH S. BEEMSTERBOER
United States Attorney                              Acting Chief
Western District of Pennsylvania                    Fraud Section, Criminal Division
PA ID No. 317227                                    U.S. Department of Justice



ERIC G. OLSHAN                                      LEILA E. BABAEVA
Assistant United States Attorney                    NATALIE R. KANERVA
IL ID No. 6290382                                   Trial Attorneys